# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PETER WEAVER,                       .    Case No. 3:02-CV-01328
                                    .    (AHN)
              Plaintiffs,           .
                                    .    Bridgeport, Connecticut
     v.                             .    March 14, 2005
                                    .
JEFFERY P. APUZZO, ET AL.,          .
                                    .
              Defendants.           .
.  .  .  .  .  .  .  .  .  .  .  .  .

ORAL ARGUMENT
BEFORE THE HONORABLE ALAN H. NEVAS
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:            Williams & Pattis
                              By:  JOHN R. WILLIAMS, ESQ.
                              51 Elm Street, Suite 409
                              New Haven, CT 06510

For the Defendants:           Rome McGuigan Sabanosh
                              By:  BRIDGET M. CIARLO, ESQ
                              One State Street, 13th Flr.
                              Hartford, CT 06103

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

1           (Proceedings commenced at 2:30 p.m.)

2               THE COURT:  Afternoon.

3               MR. WILLIAMS:  Good afternoon, Your Honor.

4               MS. CIARLO:  Good afternoon, Your Honor.

5               THE COURT:  Okay.  Just for the record,

6       please, for the reporter, would you just go identify

7       yourselves?  Mr. Williams?

8               MR. WILLIAMS:  John Williams, Your Honor, for

9       the plaintiff.

10              MS. CIARLO:  Your Honor, Bridget Ciarlo for

11      the defendant, Richard Tulisano.

12              THE COURT:  Okay.  It's your motion.

13              You want to begin, please?

14              MS. CIARLO:  Is this okay with Your Honor, or

15      would you prefer that I --

16              THE COURT:  No, you can stay there if you

17      want.

18              MS. CIARLO:  Okay.  Good afternoon, Your

19      Honor.

20              Despite the plaintiff's characterization of

21      his claim as a breach of contract action, this action

22      is essentially a legal malpractice action.  It was

23      originally brought by the plaintiff, Peter Weaver, a

24      sculptor, against the defendant attorneys, Jeffery

25      Apuzzo and Richard Tulisano, in connection with legal

1    representation that he sought from Mr. Tulisano, with

2    respect to damages that were sustained to a piece of

3    sculpture that he had created.

4         The plaintiff has since withdrawn his claim

5    against Mr. Apuzzo, and Mr. Tulisano is therefore the

6    remaining defendant.

7         The relevant facts, as set forth in the

8    defendant's 56(a)(1) statement, are as follows:

9         In May of 1996 --

10        THE COURT:  I'm familiar with the facts.

11        MS. CIARLO:  You're familiar with the facts?

12        THE COURT:  Yes.

13        MS. CIARLO:  Okay.  Thank you, Your Honor.

14        The defendant moves for a summary judgment,

15   contending that there are no genuine issues of material

16   fact, and that the defendant is entitled to matter --

17   to judgment as a matter of law because despite the

18   allegations of the plaintiff's complaint, the evidence

19   that has been submitted demonstrates that the defendant

20   did not enter into a written contract with the

21   plaintiff on October 8th, 1997.

22        The plaintiff, in his deposition testimony,

23   specifically on pages 57 and 87, concedes that the

24   retainer agreement that was sent to him, dated 10-8-97,

25   from Mr. Tulisano, was never signed by either the

1    plaintiff or the defendant.

2         Further, the plaintiff seems to concede, in

3    his 56(a)(2) statement, that there was no written

4    agreement entered into between the parties on 10-8.

5    Paragraph 3 refers to the retainer agreement, dated 10-

6    8, as a proposed agreement.

7         Paragraph 10 states that the original 10-8

8    agreement wasn't signed, and that Tulisano thereafter

9    agreed to represent the plaintiff in conjunction with

10   this matter.  Well, if he thereafter agreed to

11   represent the plaintiff in conjunction with this

12   matter, then he didn't agree to do so on 10-8-97.

13        THE COURT:  Is there a requirement now, posed

14   by whatever the regulatory authority is, that there

15   must be a written retainer agreement --

16        MS. CIARLO:  The rules --

17        THE COURT:  -- when -- If I want to hire a

18   lawyer now everything has to be in writing.

19        Is that the rule?

20        MS. CIARLO:  That's correct, Your Honor.

21        THE COURT:  Okay.

22        That's a rule of practice adopted -- It's in

23   the practice book?

24        MS. CIARLO:  It's a rule of professional

25   conduct, Your Honor.

1         THE COURT:  Okay.

2         MS. CIARLO:  Yes.

3         The evidence also demonstrates that there was

4    no contract between the parties, pursuant to which the

5    defendant specifically agreed to represent the

6    plaintiff in litigation, as he alleges in his

7    complaint.  Specifically, the defendant -- there was no

8    agreement between the plaintiff and the defendant in

9    which the defendant specifically agreed to bring a

10   negligence action on behalf of the plaintiff.

11        In his deposition testimony, the plaintiff

12   indicates that the agreement that he had with Mr.

13   Tulisano, was for Mr. Tulisano to collect money under

14   the insurance policy.

15        THE COURT:  At the time this action was

16   brought, had the statute of limitations run on a

17   malpractice action, if a malpractice action -- If

18   you're correct that the proper course of action here

19   should have been to bring a malpractice action, had the

20   statute run on a --

21        MS. CIARLO:  Yes, --

22        THE COURT:  -- malpractice --

23        MS. CIARLO:  -- it had, Your Honor.

24        The latest, from what I can tell based on the

25   allegations and the proof submitted here, the latest

1    bad act or omission that could have occurred would have

2    been at the end of the representation, which was

3    severed at the latest, in 6 -- June of 1999.  So three

4    years from there would have been June of 2002.  This

5    complaint was not filed until July of 2002, and that is

6    why the defendant maintains that this really isn't a

7    breach of contract, it's a tort claim disguised as a

8    breach of contract claim, in order to get it within

9    some applicable statute of limitation, so that it could

10   go forward with the claim.

11             THE COURT:  Because you claim that the

12   statute had run on a legal malpractice action?

13             MS. CIARLO:  Your Honor, I don't believe that

14   we have specifically alleged that as a defense --

15             THE COURT:  I understand that but, I mean, --

16             MS. CIARLO:  Right.  Right.

17             Yes, Your Honor, that that would be our

18   claim, and the interpretation of the pleadings, of

19   course, is a question of law for the Court, and we

20   would maintain that this truly is a legal malpractice

21   claim, and therefore the statute of limitations has run

22   in this claim.

23             As I stated, the evidence also demonstrates

24   that there was no specific agreement between these

25   parties.  There was no contractual agreement in which

1   Mr. Tulisano agreed to institute a negligence claim on

2   behalf of the plaintiff.

3          This -- The plaintiff's understanding that

4   this was an insurance claim, and it was the defendant's

5   understanding that it was -- it -- this was an

6   insurance claim and, in fact, in Exhibit A of the

7   plaintiff's 56(a)(2) statement, they've attached a

8   memorandum from Mr. Tulisano to another attorney in the

9   firm, in which Mr. Tulisano states as much, that this

10  was an insurance claim.

11         Finally, there was no contract between the

12  parties pursuant to which the plaintiff agreed to pay

13  an hourly fee of $225 an hour to the defendant.

14  Although the retainer agreement proposed such a fee,

15  that agreement was signed by neither party, and in his

16  deposition testimony, again, Mr. Weaver testified that

17  it was his understanding of the agreement, that the

18  defendant/attorney would receive some percentage of

19  whatever was recovered from the insurance company,

20  which tells me that Mr. Weaver believed that this was a

21  contingency fee agreement.

22         THE COURT:  What's -- If you lost this case,

23  what's the most that the plaintiff could recover?

24         MS. CIARLO:  That's a good question, Your

25  Honor.

1          Although Mr. Weaver has alleged that this

2    claim is worth over $75,000, because he put a price tag

3    on this sculpture of $100,000, the sculpture was only

4    insured for $70,000.

5          Further, the contract that he signed with

6    Hollycroft Foundation, to display the sculpture during

7    this exhibition, provided that if the sculpture was

8    bought, that Hollycroft would be entitled to a 30

9    percent commission.

10          So the most I could see Mr. Weaver ever

11    getting out of this is $70,000.

12          THE COURT:  Well then if that were the case,

13    he's below the threshold; is he not?

14          MS. CIARLO:  Yes, Your Honor, that's a good

15    question.  That goes to whether or not this Court even

16    has jurisdiction over this cause of action.

17          Now, I think the standard is legal certainty,

18    by, you know, pretty -- it has to be pretty much a

19    legal certainty that, you know, based on the face of

20    the complaint, that the plaintiff would never be able

21    to recover that amount, and I would maintain that it is

22    a legal certainty.

23          If he was only insured for $70,000, I don't

24    see how he could get more than that.

25          THE COURT:  Is interest -- Would he be

1   entitled to interest if he recovered, and then does

2   interest --

3           MS. CIARLO:  I --

4           THE COURT:  -- add to the amount so that he

5   could conceivably or theoretically be above the

6   threshold?

7           MS. CIARLO:  I thought that the threshold

8   $75,000 was exclusive of interest but, Your Honor, I'm

9   not sure.

10          THE COURT:  I think the claim has to -- the

11  claim itself has to be --

12          MS. CIARLO:  Exceeding 70 --

13          THE COURT:  -- meet the $75,000.

14          Okay.  Go ahead.

15          MS. CIARLO:  While we're on that subject of

16  subject matter jurisdiction, in reviewing the

17  deposition testimony, in preparation for oral argument

18  today, I came across a -- Mr. Weaver was asked where he

19  lived, where he resided, and his response was that he

20  resided part of the time in Connecticut and part of the

21  time in Massachusetts.  Of course, the deposition was

22  taken after the complaint was brought, but that raised

23  some question in my mind as to where Mr. Weaver is

24  actually domiciled, and therefore, whether there even

25  exists diversity jurisdiction.

1          Now --

2          THE COURT:  Do you raise that in your moving

3  papers?

4          MS. CIARLO:  No, it's not, Your Honor.

5          I am new to this file.  I prepared for oral

6  argument and came across it.  It raised a question in

7  my mind, and when Your Honor brought it up, it jogged

8  my memory, and I just wanted to bring it to your

9  attention.

10         THE COURT:  All right.

11         MS. CIARLO:  Shall I continue?

12         THE COURT:  Go ahead.

13         MS. CIARLO:  Okay.

14         Further, even if there were some contract

15  between the plaintiff and defendant in this case, there

16  was no breach of that contract by failing to institute

17  a negligence action on the part of Mr. Tulisano,

18  because he never had any contractual duty to do so.

19         In sum, based on the proof submitted by the

20  parties, there's no genuine issue of material fact in

21  dispute, as to whether there was an agreement entered

22  into between the parties on 10-8-97, pursuant to which

23  the defendant was required to bring a negligence action

24  on behalf of the plaintiff, and the plaintiff was

25  required to pay hourly fees of $225 an hour.

1    Because there was no such agreement, there
2    can be no breach of such agreement -- such an
3    agreement, and therefore, the defendant is entitled to
4    judgment as a matter of law.

5    Second, the defendant is entitled to judgment
6    as a matter of law because the plaintiff has failed to
7    disclose a standard of care expert in this case.

8    As I said at the outset, this is essentially
9    a legal malpractice action, and the fact that the
10   plaintiff has couched his claim in terms of a contract
11   does not excuse him from having to provide expert
12   testimony on what the applicable standard of care was,
13   and the plaintiff doesn't seem to take issue with that.

14   The plaintiff's argument is that this case
15   falls within an exception to the general rule that says
16   if the falling below the standard of care is so gross
17   and so obvious that the jury can figure it out for
18   themselves, you don't need expert testimony, and the
19   plaintiff specifically argues that failing to file a
20   negligence action within the applicable two year
21   statute of limitations is such an obvious, gross lack
22   of care, that the jury in this case wouldn't need
23   expert testimony on that issue; however, that argument
24   assumes that the defendant had some duty, contractual
25   or otherwise, to bring such a claim, and as I stated at

1    the beginning of my argument, there was no such

2    contractual duty here.

3            The evidence that has been submitted

4    demonstrates to the contrary, that that wasn't the

5    agreement.  There was no specific agreement to bring a

6    negligence action.  The parties treated this as an

7    agreement to pursue a claim against the insurance

8    company.  Therefore, no contractual duty.

9            Now, whether there was a legal duty on the

10   part of Mr. Tulisano, to bring such an action, would

11   require expert testimony.  Whether, under the facts and

12   circumstances of the case, that was presented to Mr.

13   Tulisano, whether he should have figured out that this

14   case required him to bring a negligence action on

15   behalf of the plaintiff, is an issue that would require

16   expert testimony.  The plaintiff has failed to disclose

17   an expert within the applicable deadline for doing so,

18   which I believe was May 1st of 2003, and for that

19   reason the defendant is also entitled to judgment as a

20   matter of law.

21           Does Your Honor have any questions?

22           THE COURT:  No.

23           Have you filed an appearance?

24           MS. CIARLO:  Yes, I have.

25           Thank you, Your Honor.

1          THE COURT:  Okay.

2          Mr. Williams?

3          MR. WILLIAMS:  Thank you, Your Honor.

4          Try to go through ticking off the points that

5    have been made, and obviously Your Honor --

6          THE COURT:  Well, let me start out by asking

7    you this question, Mr. Williams.

8          Isn't this a classic legal malpractice claim?

9          MR. WILLIAMS:  Well, Your Honor, the

10   Connecticut Appellate Court addressed that issue in the

11   Mac's Car City case, and has done so in other cases as

12   well, but the Mac's Car City case, which is in my brief

13   is, I think, the leading case on that, and the mere

14   fact that an action could have been brought as a legal

15   malpractice action does not necessarily mean that it

16   cannot be brought as a breach of contract action if, in

17   fact, there is an agreement for a specific undertaking

18   that isn't covered, and that is what we have here.

19         THE COURT:  But there was no signed

20   agreement.

21         MR. WILLIAMS:  Well, Your Honor, there isn't

22   a signed agreement, as such, but I think it's not

23   seriously disputed that you can create a written

24   contract out of a series of writings.  It doesn't

25   necessarily have to be one, single document, and we do

1   have a series of writings here.

2          We start, of course, with Exhibit -- I'm

3   sorry, Exhibit 5, attached to the moving papers, which

4   is the draft contract.

5          We go from that -- If you just were to take

6   that alone, plus the writing of Attorney Tulisano --

7          THE COURT:  So that was never signed,

8   correct?

9          MR. WILLIAMS:  Well, it was created by

10  Attorney Tulisano --

11          THE COURT:  I understand that, but it wasn't

12  signed.

13          MR. WILLIAMS:  No, that's correct, but it

14  doesn't have to --

15          THE COURT:  If he didn't sign the -- it's in

16  the form of a letter, but he didn't sign it, nor did

17  your client.

18          MR. WILLIAMS:  That's -- That is correct,

19  Your Honor.

20          THE COURT:  Okay.  So what's the next --

21          MR. WILLIAMS:  You don't have to have -- it

22  doesn't have to bear his signature, as long as it is a

23  writing that he was creating -- that he created for it

24  to be a part of a collection of writings that evinces

25  the meeting of the minds.

1           The question is if you have written documents
2    which, taken together, show a meeting of the minds,
3    however limited that may be, then that is, if a jury so
4    finds, a written contract.  You have enough written
5    material here from which a jury could find the
6    existence of a written contract.

7           THE COURT:. So how do you get around the rule
8    -- the Connecticut rule that in order to retain a
9    lawyer, you have to have a written agreement?

10          MR. WILLIAMS:  That, Your Honor, is not a
11   rule of contract law.  That is a rule of professional
12   responsibility which is, in no way, applicable to the
13   agreement between the parties.

14          In other words, Attorney Tulisano
15   unquestionably violated the Code of Professional
16   Responsibility here, in that he did undertake a
17   representation without a four corners document signed
18   by him and Mr. Weaver, and that's particularly true --
19   that's particularly apparent if you take a look at
20   Attorney Tulisano's memo to Attorney Apuzzo, wherein he
21   specifies that the terms of the representation are
22   contingency because the Code of Professional
23   Responsibility, long before the date of that memo,
24   required that there be a single, signed document for
25   contingency fee representation.

1              That, Your Honor, however, has nothing
2    whatsoever to do with, and indeed would be inadmissible
3    concerning the legal dispute between the two parties.
4    It would only be relevant if this were a fee dispute,
5    so that this -- these really are two parallel lines,
6    Your Honor, which cannot ever meet.
7              So, the fact that there's a requirement of
8    a --
9              THE COURT:  Look at your complaint, Mr.
10   Williams.
11             What do you allege in your complaint?
12             MR. WILLIAMS:  What I allege in my complaint,
13   Your Honor, is that there was a written contract that
14   was entered into on October 8th, 1997 with certain
15   provisions.
16             THE COURT:  But you don't allege a series of
17   contracts.
18             MR. WILLIAMS:  No, Your Honor, I allege that
19   there was a contract, and I think that --
20             THE COURT:  Yeah, but you allege -- paragraph
21   -- I'm looking at paragraph 6 of your complaint.
22             MR. WILLIAMS:  Right.
23             THE COURT:  You say:
24             "On October 8th, 1997 the defendants entered
25              into a written contract."

1           MR. WILLIAMS:  That's correct.

2           THE COURT:  Well, what happened on October 8?

3    What was there -- Where is the written contract of

4    October 8th?

5           MR. WILLIAMS:  On October -- Your Honor,

6    October 8th was the commencement of a series of --

7           THE COURT:  But you don't allege that.

8           MR. WILLIAMS:  You're right, because the

9    evidence, as it developed, modified what was alleged in

10   the complaint, --

11          THE COURT:  But you didn't --

12          MR. WILLIAMS:  -- but I can always amend the

13   -- As long as it doesn't state a new cause of action, I

14   can always amend the complaint to conform to the

15   evidence, as long as I'm not stating a new cause of

16   action.

17          This is not an argument on the pleadings --

18          THE COURT:  But it is a different cause of

19   action, isn't it?

20          MR. WILLIAMS:  No, it's --

21          THE COURT:  It's one cause of action to

22   allege a contract on a specific date, and say there's

23   been a breach of that contract.  That's one cause of

24   action, but isn't it a different cause of action to

25   say, "Well, we didn't have a written contract on

1    October 8th, but that was the beginning of a series of

2    exchanges of written agreements, and therefore this

3    claim is based on a series of unwritten, or unsigned,

4    rather, --

5              MR. WILLIAMS:  No, that's not a --

6              THE COURT:  -- contract --

7              MR. WILLIAMS:  That's not a different cause

8    of action, Your Honor.  That's a mere scrivener's

9    issue, to say that there was a contract on Date X and

10   to change that to say there was a contract on Dates X

11   through Y is a scrivener's issue.  That's not a cause

12   -- a separate cause of action.

13             THE COURT:  But isn't it a legal -- Isn't

14   there a difference in the theory?

15             MR. WILLIAMS:  No.

16             THE COURT:  One theory is a breach of a

17   specific written contract, and the other -- and another

18   theory is a breach of a series of written agreements

19   which constitute a contract.

20             MR. WILLIAMS:  I don't think so, Your Honor.

21             THE COURT:  That's two different theories.

22             MR. WILLIAMS:  I understand exactly what

23   you're saying, Your Honor.

24             It's a fair statement of the change in our

25   legal claim, but it is not correct, I submit, to say

1  that that constitutes a separate cause of action.  I
2  think it's the same cause of action, differently
3  presented with a certain variance of the proof, but
4  we're not at the pleading stage here.  We're not
5  arguing about the specificity of pleadings, we're
6  talking about whether there's enough proof to take a
7  claim to the jury, and I submit, Your Honor, that there
8  is because there's enough here from which a jury could
9  conclude that over a period of time, beginning on that
10 date, a series of written documents were created which,
11 in fact, taken together, constitute a written contract.
12 That's my claim.

13          THE COURT:  What about the $75,000 threshold
14 issue?

15          MR. WILLIAMS:  Your Honor, there's no
16 question in this case that we have articulated a claim
17 of a hundred thousand dollars, and that is set forth in
18 Mr. Weaver's deposition.  He contends -- He swears that
19 Attorney Tulisano himself told him that the case was
20 worth a hundred thousand dollars.  That's what we're
21 suing for.  The jurisdictional amount is that which is
22 stated in good faith in the pleading, it's not what the
23 evidence ultimately shows.  So we clearly meet the
24 jurisdictional amount.

25          Similarly, Your Honor, with respect to the

1   issue of residence, and I suspect Your Honor isn't
2   gonna focus on this, but on the issue of residence, the
3   question is not whether subsequent to the filing of
4   this suit, Mr. Weaver moved, the question is where was
5   his residence on the dates it was filed.  So that's not
6   --
7           THE COURT:  I just want to go back to the --
8   this October 8th agreement.
9           Who was that agreement with?
10          MR. WILLIAMS:  The agreement was with Mr.
11  Tulisano and Sorokin, Sorokin, Gross, Hyde & Williams,
12  P.C., and --
13          THE COURT:  Where does it say that?
14          MR. WILLIAMS:  Well, --
15          THE COURT:  Isn't the agreement with the
16  firm?
17          MR. WILLIAMS:  It's -- Yeah, it is, Your
18  Honor, with the firm, but the firm, by the time this
19  lawsuit was filed, had ceased to exist.  The
20  corporation was dissolved, and so the suit was brought
21  against --
22          THE COURT:  What difference does that make?
23          MR. WILLIAMS:  -- a member of that firm -- a
24  member of that corporation.
25          THE COURT:  No, but what -- if the firm was

1    dissolved, the insurance still exists.  I mean, they

2    carry --

3             MR. WILLIAMS:  There's no corporation to

4    serve with the complaint.  I explored that, Your Honor.

5    I -- There was no such thing as Sorokin, Sorokin,

6    Gross, Hyde & Williams, P.C. on the date that this

7    complaint was filed.

8             So it is, I think, permissible.

9             THE COURT:  So how can you sue a member of

10   the -- he was a shareholder in the corporation; was he

11   not?

12            MR. WILLIAMS:  Well, Your Honor, he was --

13   because it's a professional corporation, I think his

14   role is a little bit broader than that, and I would

15   direct Your Honor's attention to the -- I would direct

16   your attention --

17            THE COURT:  I mean, let's assume -- I'd

18   assume your firm -- Is your firm a P.C.?

19            MR. WILLIAMS:  LLC.

20            THE COURT:  LLC, okay.

21            So let's assume somebody wanted to sue your

22   firm, and instead of suing your firm they sued you

23   individually.

24            MR. WILLIAMS:  Happens all the time.

25            THE COURT:  Well, --

1        MR. WILLIAMS:  That's what they do.  That's

2   what -- because it's the nature of a professional

3   corporation that you can't --

4        THE COURT:  So if they did that -- if they do

5   that, you turn the complaint over to your carrier,

6   correct, your malpractice --

7        MR. WILLIAMS:  Right.

8        THE COURT:  -- carrier, and wouldn't the

9   malpractice carrier then say to the plaintiff, in that

10  case, "You've sued the wrong person"?

11       MR. WILLIAMS:  No.  Quite the contrary

12  actually, Your Honor.  I had the exact opposite

13  experience, to my chagrin, of bringing an action

14  against a P.C. and getting a judgment against a P.C.,

15  and the members of the P.C. said, "Na, na, na, the P.C.

16  doesn't exist anymore," and I was never able to collect

17  that judgment, though without a doubt the malpractice

18  had been committed by individuals in the P.C., because

19  that's the only way it can be undertaken.  The P.C., as

20  an entity, is simply a shell.

21       You have to sue the individual members if you

22  realistically hope to be able to collect, and in this

23  case, Your Honor, I would direct your attention to

24  Attorney Tulisano's memo to Attorney Apuzzo, dated June

25  18, '98 which, as you know, we contend is a part of the

1   documents that constitute the contracting, in which he

2   specifically refers to Mr. Weaver as his personal

3   client.  "Do you wish to handle this matter on my

4   behalf?", he says, so -- and he also talks about how he

5   has modified the retainer agreement, so I don't have

6   any doubt in my mind that it's Attorney Tulisano and,

7   in fact, only Attorney Tulisano who's got the

8   responsibility here and, in fact, as I pointed out in

9   my 56 statement -- Rule 56 statement, by the time

10  Attorney Apuzzo's eyes first fell on any document

11  containing the name "Peter Weaver," the statute of

12  limitations had already expired.

13          So clearly it's not his problem, and that's

14  why I let him out of this case.

15          THE COURT:  I just want to go back to that

16  $75,000 amount again, Mr. Williams.

17          He listed it with the dealer for $100,000

18  correct?

19          MR. WILLIAMS:  Correct.

20          THE COURT:  And the dealer was gonna get a 30

21  percent commission.

22          MR. WILLIAMS:  If it was sold.

23          THE COURT:  If it was sold.

24          MR. WILLIAMS:  And if it wasn't sold, which

25  it wasn't, then it's his, and he states that the -- so

1    that that constitutes an expression of his belief and

2    the dealer's belief that the fair market value of the

3    property was a hundred thousand, and so if the property

4    is destroyed in the hands of the dealer, the damage

5    claim is a hundred thousand dollars.  That's what he

6    got.

7                   THE COURT:  Okay.

8                   Would you have -- Would you require or would

9    there be required, if this case were tried, evidence

10   with respect to the value of the sculpture?  Putting

11   aside what he thought it was worth, or what the dealer

12   thought it was worth, would you have to offer -- you,

13   the plaintiff, have to offer expert testimony?

14                  MR. WILLIAMS:  No.  I wouldn't have to, Your

15   Honor.  I could, I suppose, except that I haven't

16   disclosed such an expert, but it's -- I think it's a

17   common place of the law that the owner of property is

18   qualified to testify to its value.  Mr. Weaver can

19   testify to its value, so that's how we would prove our

20   hundred thousand dollars.

21                  So there really isn't the need of an expert,

22   and I think that there certainly isn't the need of an

23   expert to say that if you blow the statute of

24   limitations, that that falls -- that that's either a

25   breach of contract in this case, or below the standard